## QUARLES et al. v. EATON–BLEWETT CO.*
#### (No. 8939.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 7, 1918. Rehearing Denied Jan. 18, 1919.)

1. FRAUDULENT CONVEYANCES ⟐159(1) — SUBSEQUENT CREDITORS — KNOWLEDGE OF GRANTEE.

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 3967, a conveyance made with intent to defraud subsequent creditors may be held void, where grantee had knowledge at time of conveyance of fraudulent purpose of grantor.

2. FRAUDULENT CONVEYANCES ⟐298(4) — SUBSEQUENT CREDITORS—PROOF OF FRAUD.

While insolvency of a grantor at time of a conveyance or by reasons thereof is not in itself sufficient to render void said conveyance as to subsequent creditors, and while the creation of debts thereafter by the grantor is not sufficient to establish the fraudulent intent with which the conveyance was made, yet such facts and circumstances connected with entire transaction may constitute proof sufficient to show an intent to defraud subsequent creditors.

3. FRAUDULENT CONVEYANCES ⟐298(4), 301 (4)—SUBSEQUENT CREDITORS—EVIDENCE.

In action involving a conveyance of a farm and personal property, evidence *held* sufficient to justify finding that conveyance was executed by husband to wife with intent to defraud future creditors, and that such intent was shared by grantee, who had knowledge at time indebtedness was created that husband was purchasing goods on credit, and that he was insolvent.

4. EVIDENCE ⟐230(4) — DECLARATIONS OF GRANTOR.

Statements of grantor in absence of grantee that a conveyance of land and personalty was intended as a will was not admissible in an action involving the rights of creditors.

5. APPEAL AND ERROR ⟐1050(2)—HARMLESS ERROR—ADMISSION OF EVIDENCE.

In an action involving question whether conveyance was in fraud of creditors, admission in evidence of a declaration of grantor that conveyance was intended to take place of a will was harmless; character of instrument, so far as its recitals were concerned, not being in issue.

6. FRAUDULENT CONVEYANCES ⟐286(4) — EVIDENCE— SUBSEQUENT CONDUCT OF PARTIES.

In action involving question whether a conveyance from husband to wife was made to defraud subsequent creditors, evidence that prior to year of conveyance grantor was a close buyer, but that during said year he was a liberal buyer, was admissible both against husband and wife, who received benefit of such purchases and in some instances bought articles herself.

7. INJUNCTION ⟐199—RELIEF TO DEFENDANT—STATUTORY PENALTY.

In injunction suit, where such issue was not submitted to jury nor requested by either party, though defendant in its answer asked for penalty provided under Vernon's Sayles' Ann. Civ. St. 1914, art. 4667, *held* that court erred in allowing defendants 10 per cent. damages in way of statutory penalty.

Appeal from District Court, Erath County; J. B. Keith, Judge.

Suit by L. A. Quarles and another against the Eaton-Blewett Company. Judgment for defendant, and plaintiffs appeal. Reformed and affirmed.

R. L. Thompson, of Stephenville, for appellants.
W. P. Gibbs, of Gordon, for appellee.

BUCK, J. This is an appeal from a judgment of the district court of Erath county, dissolving a temporary injunction theretofore granted upon the petition of Mrs. L. A. Quarles, joined pro forma by her husband, John Quarles. She alleged that she possessed in her own separate right, and was the owner and holder of the legal and equitable title to certain described real estate located in Erath county, consisting of some 319 acres, and of certain personal property consisting of cattle and horses. It was further alleged that she held title to said real estate by deeds, duly recorded in the office of the county clerk of Erath county, and that thereafter there was issued out of the district court of Erath county a certain order of sale in the case of Eaton-Blewett Company v. John Quarles, under a judgment in said cause against said John Quarles for the sum of $892.47, and for a foreclosure of an attachment lien theretofore levied upon said real estate as the property of said John Quarles,

---

said order of sale having been placed in the hands of the sheriff of Erath county, and that the sheriff had advertised said land for sale, and would proceed to sell it to satisfy the judgment against John Quarles, unless' enjoined from so doing. A temporary injunction was granted, but upon a hearing upon the merits the same was dissolved, and plaintiff has appealed.

The salient facts are that John Quarles and his wife, Mrs. L. A. Quarles, had accumulated as the fruits of their joint labor and efforts during a period of some 35 years, about 1,000 acres of farm and pasture land in Erath county and near to the town of Gordon, and also certain live stock and other personal property. On January 25, 1915, John Quarles conveyed all of said land and personal property to his wife during her natural life, and the instrument further provided that at the death of Mrs. Quarles the estate should descend to and be divided among their five children named. The instrument recited as follows:

"Know all men by these presents: That I, John Quarles, of said county and state (on the condition that the grantee herein allows to me the sum of thirty-three and one-third dollars per month during my natural life), for and in consideration of the love and affection that I have for her, and the further consideration that she pay to me the said sum above mentioned during my lifetime and the further consideration that she give me a home during my lifetime, have granted, sold and conveyed and given, and do by these presents grant, sell, convey and give to my wife, L. A. Quarles of Erath county, Texas, all the following described real estate and personal property."

The evidence discloses that the instrument of conveyance was filed for record on the date of its execution; that at this time the children of Mr. and Mrs. Quarles were all grown, or practically so, and that one son, Tobe, was married; that the property described in the instrument of conveyance was all community property of John Quarles and his wife; and that he had no separate property. During the year 1915, and beginning shortly after the date of the execution and record of said instrument of conveyance, and ending October 9th, John Quarles incurred an indebtedness to Eaton-Blewett Company of some $853.10. The items purchased consisted of groceries, farm implements, clothes, fence posts, a wagon, a hay press, plows, and, generally, such articles as would ordinarily be used by a family and on a farm. Of this amount, $6.30 was purchased during 1914, $17.10 was purchased during January, 1915, but prior to the date of the deed. A credit for $22.40, rent of a stable, was allowed Quarles on January 5th. Hence practically the entire indebtedness was incurred after January 25, 1915. During the same period, that is, from January 25th to some time in October, 1915, Quarles purchased,

from the Hardin Lumber Company of Gordon, lumber and other building material in the sum of $723.26. This material, the evidence shows, was placed in the home and on the premises occupied by Mr. and Mrs. Quarles. During the same time Quarles purchased from J. W. Conway, also a merchant at Gordon, various articles of general merchandise, dry goods, hardware, etc., making a total of $775.32, from February to October 22d. He also purchased during said period, from J. M. Oden, farmers' supplies of the same character, in the total sum of $708.80. The total purchases during said period aggregated something over $3,000. While some of these goods were purchased by the adult children of John Quarles and by his tenants, he had instructed the merchants to sell to the said children and to the tenants and charge the items to him.

In October the adult son of Quarles brought some cotton into Gordon for sale. It had been customary that when farmers were indebted to merchants for them to sell to said merchants their cotton and other farm products as they were gathered, and to permit the same, or at least a portion thereof, to apply on their indebtedness. When young Quarles, by whom some of the articles bought had been purchased and who lived on his father's place, was asked by one of the merchants interested if he would sell his cotton and allow the proceeds to apply on the indebtedness, he replied that he did not owe anything, and must have cash for the cotton. This unexpected attitude on the part of young Quarles caused some surprise, and the investigation following resulted in the discovery that John Quarles was indebted to the several merchants mentioned in an aggregate amount largely in excess of what had been his usual and customary annual expenditure. The creditors had a "grove meeting." It appeared that each merchant dealing in general merchandise had thought that Quarles was dealing exclusively with him, and that during former years Quarles' total account did not run in excess of some $700. Following a report of the execution and record of this instrument of conveyance, parties were sent to Stephenville, the county seat, and found that the report was true, and that the instrument was on record. Then the creditors sent representatives to see Quarles, who lived some seven or eight miles from Gordon. He admitted the execution of the instrument and acknowledged that he had no present means of paying the indebtedness, or any property with which it could be paid, but stated that he would try to borrow the money with which to settle it. The creditors offered to take notes signed by Quarles and his wife, but Mrs. Quarles refused, and John Quarles failed to execute the notes sent for that purpose. Quarles also declined to tell W. P. Gibbs, attorney for appellee, from what

source he expected to get the money to satisfy the indebtedness to that company. Suits were then filed by the several creditors and judgment obtained against John Quarles. Upon an effort to satisfy the Eaton-Blewett judgment out of a portion of the real and personal property, the injunction application by Mrs. Quarles, joined by her husband, followed.

Appellant urges that as without controversy the indebtedness of John Quarles was incurred subsequent to the conveyance by him to his wife, such conveyance could not be in fraud of the creditors. Appellee, defendant below, pleaded the insolvency of John Quarles at the time of the accrual of the indebtedness complained of, that the articles purchased were reasonably necessary for the support and maintenance of Mrs. Quarles and her children, and certain of the articles, such as lumber and other building material, farm implements, etc., were for the benefit of Mrs. Quarles' claimed separate estate in the property involved, and constituted valuable and permanent improvements upon her real estate, thus enhancing the value thereof, and that both plaintiffs purchased and appropriated all of the goods for which the indebtedness was incurred with the full knowledge on the part of Mrs. Quarles of the insolvency of her husband, by reason of the conveyance aforesaid, of which insolvency defendant had no notice or knowledge whatever. Mrs. Quarles accepted said goods and used them for the benefit of her children, and that she became liable, and promised to pay for them.

Appellee further alleged that the real estate and the personal property was the community estate of Mr. and Mrs. Quarles, and that Mrs. Quarles accepted the conveyance of said community estate to her with the full knowledge of the intention of her husband to purchase goods, wares, and merchandise largely in excess of what he had theretofore purchased annually, and that she received and used said goods and accepted and ratified all of the transactions in question with the full knowledge of her husband's insolvency, and with the full knowledge that he intended at the time to defraud the merchants and tradesmen with whom he was dealing out of the value of said goods; that prior to said time it had been the custom of plaintiffs to purchase, from the defendant and the other merchants at Gordon, largely on credit, running through the season, aggregating $300 or $400 a year, and that theretofore the plaintiffs had always paid their debts promptly, and had a good reputation in the said town and among said merchants for honesty and fair dealing; that said merchants, and especially defendant, having no knowledge of the change of heart on the part of plaintiffs, nor of the execution of the instrument of conveyance, relied upon plaintiffs' former conduct and reputation for honesty and fair dealing, and relied on the fact that they possessed valuable property, upon which they had for many years made good crops, and said merchants parted with their goods relying on such facts, and entirely ignorant of the intent to defraud on the part of both plaintiffs, and of the execution of the conveyance from John Quarles to his wife.

Neither plaintiff testified in the case, nor sought to explain the purchase of goods so largely in excess of their former annual purchases. No explanation was given as to the reason of the conveyance, except that John Quarles stated to the attorney for appellee, when the latter went to the farm to see him:

"I regard the conveyance to my wife as more of a will than anything else. I wanted to fix up my property so if anything happens to me the courts and lawyers would not gobble it up."

Jim Quarles, brother of John Quarles, and T. J. Quarles, his father, testified that about the time the creditors were seeking to get a settlement out of John Quarles, the latter asked if he could get some money from them with which to satisfy his creditors. Jim Quarles told John that if he could sell a certain bunch of cattle he would let him have the money received therefor. The evidence shows that Jim Quarles was asking $1,800 for said cattle, and that he allowed $15 between what he asked and what he was offered to prevent the trade. He further testified:

"I did not intend to give John the money; I was just intending to loan it to him. Yes, sir; I intended to make myself secure in the loan. I don't know just how long before I saw Judge Gibbs that day it was before John spoke to me about the money; I guess it was something like a week probably. I expected to get security just any way John could make me safe. Q. You didn't expect him to make you safe if he had no property? A. I supposed he could do it some way or another; I didn't know just how it could be fixed up."

T. J. Quarles testified that he was 84 years old, and lived about one-half mile from his son John. He further testified:

"John spoke to me about getting some money last fall, before the time that Judge Gibbs and some more parties were out there levying on John's property. I had agreed to let John have the money. I had the money in the bank at Gordon, First National. John said he guessed he would need what money I had—he said those people wanted their money, and, 'I have a chance to get some from Jim.' * * * I had before that time promised John this $500. I didn't tell Judge Gibbs anything about that."

Article 3967, Vernon's Sayles' Texas Civil Statutes, is as follows:

"Every gift, conveyance, assignment, transfer or charge made by a debtor, which is not upon consideration deemed valuable in law, shall be void as to prior creditors, unless it appears that such debtor was then possessed of property within this state subject to execution sufficient to

pay his existing debts; but such gift, conveyance, assignment, transfer or charge shall not on that account merely be void as to subsequent creditors, and though it be decreed to be void as to a prior creditor, because voluntary, it shall not for that cause be decreed to be void as to subsequent creditors or purchasers."

[1, 2] That a conveyance made with intent to defraud subsequent creditors may be held void where the grantee has knowledge at the time of the conveyance of the fraudulent purpose of the grantor is indicated by the article quoted, and is recognized by numerous authorities. While the insolvency of the grantor at the time of the conveyance, or by reason thereof, is not in itself sufficient to render void said conveyance as to subsequent creditors, and while the creation of debts thereafter by the grantor is not sufficient to establish the fraudulent intent with which the conveyance was made, yet the facts and circumstances connected with the entire transaction may constitute circumstantial proof sufficient to show the intent to defraud subsequent creditors, and, if so shown, the conveyance may be held void. Appellant relies on a line of authorities such as Lewis v. Simon et al., 72 Tex. 470, 10 S. W. 554; De Garca v. Galvan, 55 Tex. 53; Monday v. Vance, 51 S. W. 348, writ denied; O'Neal v. Clymer, 61 S. W. 545, writ denied; Searcy v. Gwaltney Bros., 36 Tex. Civ. App. 158, 81 S. W. 576; Parks v. Worthington, 101 Tex. 505, 109 S. W. 909.

In Lewis v. Simon, supra, the court held that a voluntary conveyance in fraud of existing creditors, recorded on the day of its execution, is not void as to future creditors merely because the grantor afterwards engages in extensive speculations, and soon becomes insolvent. The opinion in part is as follows:

"Conceding, therefore, that the deed from Simon to his wife was a voluntary conveyance, and that it was void as to existing creditors, this does not render it void as to subsequent creditors. The only facts remaining, from which fraud in the conveyance as to the latter class of creditors could be deduced, are that soon thereafter Simon began operating upon a large scale, and shortly became insolvent. The use of the word 'merely' in the statute quoted indicates that the Legislature contemplated that cases might arise in which a voluntary conveyance should be held void even as to subsequent creditors, but we are clearly of opinion that the facts here in evidence do not make such a case. If a grantor should voluntarily convey his property to his wife or children, and should cause the deed to be withheld from the record, intending, notwithstanding his conveyance, to obtain credit upon the faith of his still being the owner of the property, and should he accordingly obtain such credit, a strong case would be presented for holding the conveyance fraudulent, although it might be placed upon the record before the creditor secured a lien upon the property by judgment or otherwise. * * * It has been held that where a voluntary conveyance is made in contemplation of the grantor's entering upon hazardous speculations, and with a view to protect it from subsequent creditors, in the event his ventures should result disastrously, it is fraudulent as against such subsequent creditors. Wait, Fraud. Conv. §§ 100, 101, and cases cited. But the author cited also says: 'As a general rule, a subsequent creditor, who acquired his claim with knowledge or notice of the conveyance sought to be annulled, cannot attack it as fraudulent.' Id. § 106; Baker v. Gilman, 52 Barb. [N. Y.] 39. This rule has been recognized in former decisions in this court. Lehmberg v. Biberstein, 51 Tex. 457; De Garca v. Galvan, 55 Tex. 53; Van Bibber v. Mathis, 52 Tex. 406. The creditor knowing that the grantor has voluntarily parted with his property, we fail to see the device or deceit by which he can claim to have been defrauded."

In the instant case the evidence shows that the creditor had no actual knowledge of the conveyance, and that neither John Quarles nor his wife, up to the time of the visit by the creditors to the Quarles farm, ever intimated to the creditors that such conveyance had been made. In the case of Walsh v. Byrnes, 39 Minn. 527, 40 N. W. 831, cited in footnote to Lewis v. Simon, supra, it is said:

"Voluntary conveyances by an embarrassed debtor are prima facie fraudulent as to preexisting creditors, and the presumption arises from the existence of the indebtedness, and hence the rule could not, in the absence of additional facts tending to prove fraud in fact, apply to cases of subsequent indebtedness. But it is well settled that where voluntary conveyances are actually fraudulent, and the purpose or effect of the same is to prejudice subsequent creditors, such conveyances will also be void as to them. * * * And where a conveyance is made mala fide, and the fraud is participated in by both parties thereto, it is subject to be assailed by creditors, existing or subsequent. But the question whether a subsequent creditor will be entitled, in any particular case, to have a prior conveyance set aside for fraud, must be one of fact, to be determined upon its own peculiar circumstances."

In Cole v. Terrell, 71 Tex. 549, 9 S. W. 668, it is said:

"Appellants insist that the appellees were not existing or prior creditors (or claimants of damages) at the date of Wilson's deed to his wife, and therefore cannot complain at the transfer."

The court then quotes article 2466, now 3967, Revised Statutes, and further says:

"This statutory rule, as explained by itself, does not prevent a voluntary conveyance from attack by a subsequent creditor upon showing not merely that the conveyance was voluntary, but was made with fraudulent intent.

"The Texas statute of frauds (Revised Statutes, article 2465) which is a substantial reenactment of St. 13 Eliz. c. 5, has been construed and applied under the authorities from the many courts upon its terms. In Bump on Fraudulent Conveyances (2d Ed.) p. 308, referring to numerous authorities, their general effect is summed up: 'It is, accordingly, well

settled that if a party makes a conveyance of his property with the express intent to become indebted to another and to defraud him of his debt by means of this artifice, such subsequent creditor may contest, and by proof defeat, the transfer, although he was not a creditor of the grantor at the time of the conveyance.' And again: 'The simple fact of a subsequent indebt- edness is not sufficient to make a transfer fraud- ulent.' There must exist at the time, on the part of the grantor, a fraudulent view, and until this fraudulent purpose is established, either by positive proof or the exhibition of such facts as justify the inference of its actual existence, the conveyance cannot be set aside.' Id. p. 310.

"From these citations it appears that article 2466, Revised Statutes, is but a legislative ap- proval of the rule of decision theretofore follow- ed by the courts as to the effect of a voluntary conveyance as against the creditors of the gran- tor. The cases (55 Tex. 53, De Garca v. Gal- van, and 65 Tex. 658, Willis & Bro. v. Smith) where the general proposition is given that sub- sequent creditors cannot complain seem to have been cases where the conveyances were attacked without producing evidence of intent to defraud the complaining creditors."

In Dosche, Adm'r, v. Nette, 81 Tex. 265, 16 S. W. 1013, the court held that—

"A gift by an insolvent debtor would be void as to prior creditors, but not necessarily so as to subsequent creditors even though it should be decreed void as to prior creditors. Rev. Stats. art. 2466."

The Supreme Court reversed the judgment in this case because the trial court refused a special charge, submitting to the jury the question of fact as to whether the creditor had made the conveyance to his son with in- tent to place the property beyond the reach of, and to hinder, delay, or defraud, his creditors, and in contemplation of contract- ing future debts. See Rives v. Stephens, 28 S. W. 707, writ denied; Bergson v. Dun- ham, 40 S. W. 17. "The simple fact of sub- sequent indebtedness is not sufficient to make a transfer fraudulent, but there must exist at the time, on the part of the gran- tor, a fraudulent view; and, until this fraud- ulent purpose is established, either by posi- tive proof, or the exhibition of such facts as justify the inference of its actual ex- istence, the conveyance cannot be set aside." Bump, Fraud. Conv. (2d Ed.) p. 308. But it is well understood that fraud of the kind charged in this case can rarely be establish- ed by direct evidence, and resort must al- most always be had to circumstances, more or less conclusive in their nature.

[3] In the instant case, we think the tes- timony was sufficient to justify the jury in finding, as they did, that the instrument of conveyance was executed by John Quarles with intent of protecting the property there- in conveyed from the payment of future debts, and with intent to defraud future creditors, and this intention was shared by Mrs. Quarles, and that Mrs. Quarles had

knowledge at the time the indebtedness was created that her husband was purchasing goods from defendant on credit, and that he was insolvent from and after the first pur- chases were made. The evidence discloses that John Quarles was in the prime of ma- ture manhood, in good health, with no rea- sonable apprehension of premature death, that he was capable of managing the com- munity estate of himself and wife, was a good farmer, and continued to manage said estate subsequent to the conveyance in the same way as before; that in the incurring of the indebtedness to the four merchants mentioned, he never intimated that he had made such conveyance, nor did his wife, who purchased some of the goods and received the benefit of a large portion of them, dis- close any purported change in the title to the property. No pretense of the existence of any indebtedness by the husband to the wife in satisfaction of which the convey- ance was made. There is no evidence in the record that even the small monthly stipend, recited as a part of the consideration, was ever paid. Quarles and his wife had been known for many years as very economical buyers, thrifty and frugal, their yearly pur- chases had heretofore not exceeded one- fourth of the amount of the indebtedness incurred from February 1st to the latter part of October, 1915. It must be reasonably presumed that Mrs. Quarles knew of this unusual expenditure, for a large portion of it went into the repair of the house in which she lived, and most of the remainder went to pay for articles of merchandise used by the family or on the farm. The jury were justified in concluding that she knew that her husband, if the conveyance should be held valid and binding, had stripped him- self of the means of paying this large in- debtedness. By defendant's pleadings an unqualified charge of fraud was made against both husband and wife, a charge, especially in view of the previous conduct and good reputation of both parties, which they would be expected to answer by show- ing the good faith of the conveyance, but both remained as silent as "Moses' tomb." We think the facts sustain the verdict of the jury and the judgment of the court as to the issue of fraud.

[4, 5] In the third assignment complaint is made of the admission of the testimony of J. P. Browder, to the effect that when he (Browder) went out to Quarles' home to see him with reference to the indebtedness to the Hardin Lumber Company, Quarles said that he regarded the conveyance to his wife as more of a will than anything else; that he wanted to fix up his property so that if anything happened to him the courts and lawyers would not "gobble it up." This tes- timony was objected to on the ground that a party attacking a conveyance on the ground

of fraud cannot impeach the title of the grantee by statements or declarations of the grantor made out of the presence of the grantee and subsequent to the execution of the instrument of conveyance. It is true that statements of a grantor in derogation of the grantee's title, in cases of this kind, are not ordinarily admissible, but in this instance the instrument was in evidence, and there was no contention on the part of the defendant below that the instrument did not purport to convey and dispose of such title as the grantor had. It is true that the latter part of the instrument following the conveyance to the wife of the life estate, was in the nature of a will, devising and bequeathing the remainder of the estate to his children. The character of the instrument, so far as its recitations were concerned, was not made an issue by the pleading. Hence we conclude that no reversible error is shown by the admission of the testimony complained of. ·

[6] In her fourth assignment appellant complains of the admission of the testimony of the witness Louis Rogers, to the effect that prior to the year 1915 John Quarles "was a close buyer, but that during said year he was a liberal buyer, was easy to sell, and never questioned prices." It is alleged that this testimony was inadmissible, "because it is fully shown by the pleadings and the evidence that the account of John Quarles with the defendant was a contract with John Quarles in his individual capacity, after the conveyance from John Quarles to plaintiff had been made and placed of record in the proper county. * * * That L. A. Quarles was not a party to the debts of John Quarles with this defendant and was not liable therefor." We think this evidence was admissible as tending to establish the charge of fraud, as John Quarles and his wife, as shown by the evidence, had, during their more than 25 years of married life been close and economical buyers, and if immediately after the conveyance in question John Quarles began a course of liberal buying, what, in view of their former habits, might be called extravagant expenditures, and his wife received the benefit of such purchases and in some instances bought the articles herself, we think such facts were pertinent and admissible upon the issue of fraud as to both parties.

[7] The trial court found the injunction suit was brought merely for delay, and gave judgment against John and L. A. Quarles and their bondsmen for 10 per cent. damages in the way of statutory penalty. This issue was not submitted to the jury, nor was it requested by either party, though defendant, in its answer, asked for such penalty, as provided under article 4667, Vernon's Sayles' Statutes. We are of the opinion that under the facts shown, and the condition of the record, such penalty should not have been allowed; therefore we reform the judgment by eliminating such penalty, and, as so reformed, the judgment will be affirmed.

Reformed and affirmed.